# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FRANK GENER-VILLAR D/B/A<br>Gener Advertising,<br><br>Plaintiff<br><br>v.<br><br>ADCOM GROUP, INC.,<br>Debbie Alonso, President<br>SUPERMERCADO MR. SPECIAL, INC.<br>Santos Alonso-Maldonado, President,<br><br>Defendants. | CIVIL NO. 03-1306 (FAB/CVR)<br><br>INFRINGEMENT OF<br>COPYRIGHTS |

## OPINION AND ORDER

### BACKGROUND

Plaintiff Frank Gener-Villar (hereinafter "Gener" and/or "plaintiff Gener") brought suit against defendants Adcom Group, Inc., and Supermercados Mr. Special, their main officers Debbie Alonso and Santos Alonso, respectively (hereinafter "Adcom" and "Mr. Special" and/or defendants) for infringement of the copyrights to a number of photographs. Plaintiff Gener originally produced the photographs at issue pursuant to a written personal services contract with the defendant Adcom, entered into by these parties in 1996.

Under the terms of that contract, Gener was to provide Adcom with graphic art services—specifically, with camera-ready art for Adcom to use to produce "shoppers" for Mr. Special.  Mr. Special is a supermarket chain; the shoppers are printed material, distributed both on-site at Mr. Special's supermarkets and as newspaper inserts, which inform customers of various items for sale at the supermarkets.

"Camera-ready art" consists of layouts in unalterable form ready for printing.  Gener produced these layouts, and whatever other artwork Adcom required, in return for a monthly blanket payment of $3,000.00.   This payment was a blanket license; Gener produced whatever work Adcom needed for a given month. Adcom would use the work provided by Gener in that month, and the following month Gener would produce new work for Adcom's use from the templates stored in his computers.

Initially, the photographs used in the shoppers were provided to Gener by Adcom; they came from Mr. Special's suppliers or from other sources.  In 1999, Adcom decided it needed new photographs and Gener offered to supply them, using a digital camera.  Mr. Special would specify the products it wanted featured; Adcom provided the products; Gener took the photos.  Gener would then transfer the raw photographs into his computer, and, using the program Adobe Photoshop, would manipulate them as necessary to achieve an acceptable finished photograph. These manipulations included cropping (removing background), lightening or darkening, adding or removing highlights, altering colors, rotating the image, or replicating the image or a portion of it to achieve a composition.

Not all photographs Gener initially took were acceptable; sometimes re-shooting was necessary to achieve, with manipulation, the desired effect. Sometimes, products—whether packaged products or groceries—were re-shot upon requests which originated with Mr. Special and were conveyed to Gener by Adcom, because the existing images were deemed "stale" through repeated use.

Frank Gener Villar v. Adcom Group, Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 3

Under an oral agreement, Gener was paid $45.00 per photograph for the time he spent taking the pictures.  Gener stored the pictures, with his other templates, on his computer.  The blanket license which covered use of all the artwork Gener created for Adcom covered the use of the pictures also, regardless of how many or how few times they were used.  By Adcom's request, Gener attached copies of each picture to the invoices he submitted, and kept copies of these invoices, with attached pictures, in his files.

From April 29 to May 1, 2008, a bench trial was held before this Magistrate Judge for adjudication of plaintiff Gener's Complaint for copyright infringement.  The Court received and admitted documents and testimony of witnesses into evidence.  Therefore, the Court enters this Opinion and Order, with the following findings of fact and  conclusions of law and orders entry of judgment.

In the course of the three-day trial, Gener introduced witnesses and documentary evidence so as to establish his allegations that defendants are liable for copyright infringement for their reproduction and distribution of a substantial number of a group of photographs without authorization after his contract with defendant Adcom was terminated. Of the four hundred and eighty two (482) photographs produced by Gener for defendant Adcom, plaintiff showed by preponderance of the evidence unauthorized use and copyright infringement as to one hundred and fifty four (154) photographs during a total of one

Frank Gener Villar v. Adcom Group, Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 4

thousand two hundred sixty three (1,263) times,[1] in regards with co-defendants Adcom and

Mr. Especial, in the findings of facts and conclusions of law as further discussed below.

## FINDINGS OF FACT

1. Plaintiff Gener is a graphic artist since 1985.  Gener first started as a typesetter for newspapers and books.  Subsequently, he began doing artwork for newspaper ads and postcards.

2. With the advent of computer graphics, Gener began providing magazines and advertising agencies with computer produced art, working as a freelance artist or independent contractor.

3. Defendant Adcom Group, Inc., is a corporation which does commercial advertisements for, among others, the Mr. Special supermarket chain.  Mr. Special's president, Santos Alonso, is the father of Debbie Alonso, principal officer of Adcom.  Adcom started out as an Alonso family business, but now remains the property of two of Mr. Alonso's daughters.

4. Although Adcom does not have any written agreement with Mr. Special supermarkets, it conducts all the publicity for the supermarket chain, including the publishing of the shoppers widely distributed by Mr. Special.

5. Mr. Special approves an annual budget for Adcom to publish the shoppers, flyers and newspapers ads, and requires Adcom to stay within that budget.  Part of the

---

[1] Infringement and the resulting statutory damages were shown as to one hundred and thirty five (135) photographs and for nine hundred and sixty (960) publications after registration with the Copyright Office.

verbal agreement is that Mr. Special pays Adcom's 17.5% of the total cost of printing the biweekly shopper. Testimony at trial established the total cost of each biweekly shopper at approximately $17,000.00.

6.  Sometime prior to 1996, Mr. Gener began doing freelance work for Adcom as an independent contractor, providing Adcom with camera-ready graphic art from his home.

7.  Given the volume of the material requested by Adcom, in 1996 Gener signed a written agreement with Adcom, whereby for a flat monthly fee of $3,000.00 he would produce all the graphic art needed by Adcom, which was mainly for the biweekly publication of two Mr. Special shoppers per month. **Exhibit 1**

8.  The Mr. Special shoppers are printed multi-page sheets which show various items the supermarket is offering at special prices. They are distributed as newspaper inserts and on-site at the Mr. Special supermarkets.

9.  Under the 1996 agreement, in addition to the flat monthly fee he was paid for providing graphic arts, Gener was given an office space within Adcom's main office, where he could, if he wanted to, receive clients other than Adcom.

10. Adcom never limited Gener's work with other clients, as long as he met Adcom's deadlines for the graphic arts Adcom needed.

11. For all purposes Gener was considered an independent contractor, and his contract with Adcom stated this clearly.  Adcom would deduct Commonwealth professional

service taxes from the money it paid Gener.  Gener was responsible for paying the social security taxes for his monthly fee.

12. Gener's final product for each shopper was camera-ready artwork—that is to say, fixed-form or unalterable artwork ready for printing—that was sent off to Ramallo Printers to have the shoppers printed. The printed shoppers were delivered to Mr. Special to distribute at the supermarkets, or through newspapers and/or magazines.

13. The graphic art supplied by Gener in the shoppers, included the placing of photographs.  At times, the photographs had to be altered in order to place them in the particular shopper. Gener would do those alterations as part of the monthly payment for his graphic art.

14. The graphic art produced by Gener for the Mr. Special shoppers initially did not include his photographs, but included photographs supplied by Mr. Special or directly from Mr. Special's suppliers, which would be scanned by Gener and digitally incorporated into the camera-ready graphic art.

15. Around 1999, with the advent of digital photography, Gener acquired a digital camera and offered his services to Adcom to take photographs of the products that Mr. Special wanted to have pictured in its shoppers.

16. Adcom accepted Gener's offer, but never reached a written agreement on his compensation for taking the required photographs.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 7

17.  Despite lack of a written agreement, Gener began to photograph the products Mr.
Special requested to be pictured in the shoppers, and was paid $45.00 per picture
for the time he would spend taking and manipulating the picture.

18.  Mr. Special would provide Adcom with a list of the products it wanted to have
featured in a particular Mr. Special flyer, shopper or newspaper ad.  Mr. Special's list
would provide a complete description of each product which was to appear
photographed in the shopper.  At times Mr. Special would provide the photograph to
be used in the shopper; if a photograph was not provided, it had to be taken.

19.  At times, Mr. Special would order Adcom to take new photographs of products and
of generic goods such as lettuce or pork chops.  The new photos were taken to
"freshen" the photographs, either because the product had changed or because the
current photograph was considered "stale" from having been used many times.

20.  At times, Mr. Special would ask Adcom to make changes in the layout to highlight a
particular product or to take a new picture. Adcom would transmit that request to
Gener, who would satisfy Mr. Special's request.

21.  Mr. Special has a special interest in controlling the contents of each shopper since
Mr. Special's wholesale suppliers would pay Mr. Special money or give it a discount
on its products in order to have the products appear in the Mr. Special shopper.

22.  As a result of the discounts and money payments from suppliers, Mr. Special would
give orders to Adcom, specifying in detail the particular product, and the size and
prominence that each product should have in its shopper. The layout of each

shopper would have slots designated for product photos.  If Mr. Special designated a product for one of those slots, a photograph of that product would appear in the designated slot of the layout.

23.  During the time Gener prepared shoppers for Adcom, Mr. Special would meet with all its departments before the shopper was printed, review the contents, and approve the shopper or request last minute changes to be made prior to printing.

24.  Gener would take the pictures requested by Mr. Special with the camera, and then transfer the images to Adobe Photoshop, a digital editing program, in which he would manipulate the image, crop it, darken or lighten it, retouch any imperfections, and reposition or replicate elements as needed, to produce the finished picture.

25.  Once Gener had taken a picture and manipulated it to an acceptable finish using Photoshop, Gener would use it in the shoppers, flyers or newspaper ads and keep the digital image archived on his computers as part of his photo bank.

26.  The selection of acceptable pictures, the rejection of unacceptable pictures, and the substitution of "fresh" pictures for "stale" or overused pictures, demonstrate the intrinsic originality of the pictures Gener produced, over and above the originality of his being the author of the images themselves.

27.  If a picture was needed again subsequently for the graphics of a new shopper, Gener would re-use the existing image.

28.  Gener continued to receive a monthly flat fee of $3,000.00 for the preparation and use of the camera-ready art he produced as a whole.  Gener understood he was

being paid $45.00 solely for the time spent taking the pictures, whereas use of the pictures was included as part of the $3,000.00 flat licensing fee.

29.  As part of Gener's billing process for the pictures, at Adcom's request, Gener included with the invoice and purchase orders not only the list of products that Mr. Special had requested to be photographed, but also a printout copy of the pictures taken.  Gener would print out color copies of each picture and attach them to the invoices turned in and those kept with his records.  The printouts were exact copies of the photographs as taken and manipulated to an acceptable finish by Gener, then stored in his external hard drive.

30.  In 1999, Gener hired José Andrés Rosso Villanueva ("Rosso") as his assistant, to perform work for Adcom.  Rosso's main function was to set the type in the Mr. Special shoppers Gener was doing for Adcom Group, Inc.

31.  In February 2000, Adcom terminated its agreement with Gener.

32.  Following termination of its contract with Gener, Adcom demanded that he turn over to Adcom all the photographs he had taken while his contract with Adcom was in effect, which were stored on his hard drive.  Gener refused.

33.  Adcom then brought suit against Gener in the San Juan Superior Court of the Commonwealth of Puerto Rico to gain ownership of the tangible photographs.

34.  Gener claimed that this was a copyright matter over which the Commonwealth Court did not have jurisdiction.

35. Thus, Adcom was aware as of May 2000 that Gener was claiming, and seeking to protect, his rights under copyright law with regard to his photographs from the time he first raised the issue in the Commonwealth Court.

36. The Superior Court held it had jurisdiction to adjudicate controversies under Puerto Rico contract law. The Court specifically stated the case before its consideration was "not based on the author's economic rights, but on the delivery of a compact disk over which plaintiff [Adcom] alleges having an ownership right due to having paid for the information contained in it."  (Certified Translation of Judgment, Dkt. 62, Ex. No. 1, page 19).

37. The Superior Court then went on to reject considering Adcom's claim as an effort to obtain a copyright interest.  The Court also declared that the written contract between Gener and Adcom was not "work for hire" and did not come under  Puerto Rico's moral rights doctrine.

38. The Superior Court held that, under the terms of the contract, the tangible digital photographs and computer disk belonged to Adcom.  The state court declined to rule as to any copyright issue.

39. The Superior Court entered a judgment dated May 4, 2000, in case no. KPE 00-1640. The Court recognized that Gener was claiming the Commonwealth Court lacked jurisdiction over the subject matter, because his property rights over the photographs arose under 17 U.S.C. 101 *et. seq.* (*See* Certified Translation of Judgment, Dkt. 62, Ex. No. 1, p. 7-1). **Exhibit 2**.

40. Gener appealed the judgment of the Superior Court.  Almost one year later, on March 30, 2001, in appeal no. KLAN-0000775, the Puerto Rico Court of Appeals confirmed the Superior Court, upholding the jurisdiction of the lower court to act upon the contractual ownership controversy over the tangible photographs and computer disk.

41. The Commonwealth Court of Appeals noted in appeal no. KLAN-00775 that the decision by the Court of First Instance was not "a claim for an author's patrimonial rights, but a claim for the delivery of a computer diskette over which Adcom alleges having rights due to having paid for the information contained in it."   (Certified Translation of Judgment, Dkt. No. 62, Ex. 2, pages 12-13).  **Exhibit 3**.

42. Debbie Alonso, Adcom's principal, made her father Santos Alonso (Mr. Special's principal) aware through conversations of Adcom's Commonwealth Court litigation.

43. In the course of the litigation in Commonwealth Court, Gener's computer archive was impounded.  At the time the Court took the computer disk, Mr. Special was aware that certain photographs had been removed from Gener's computer and deposited in the Court, and that those photos in consequence could not be used.

44. Following the termination of Gener's contract with Adcom, Rosso was hired by Debbie Alonso, President of Adcom, to prepare camera-ready art for the shoppers as Gener had done. Unlike Gener, Rosso was hired by Adcom not as independent contractor, but as an employee.

45.  Adcom provided Rosso with a disk which it recovered from Ramallo Printers sometime on or about February 2000.  The printer's disk contained the last camera-ready shopper prepared by Gener in digital format prior to the termination of his contract.   Adcom instructed Rosso to recover as many of the digital photographs created by Gener as he could to continue using in the production of new shoppers.

46.  Thereafter, Rosso prepared the shoppers using the photos of the Ramallo disk. Rosso also began to take photographs of products as Adcom provided them to him.

47.  At no time during the litigation did Santos Alonso personally, or Mr. Special as a company, ever ask Adcom to stop using the Gener photographs.

48.  Debbie Alonso, in testimony, stated that Mr. Special knew by notations on the invoices which photographer had produced any given photo.

49.  When the Commonwealth Court delivered Gener's tangible photos to Adcom, Adcom gave the disk to Rosso.  Adcom then specifically instructed Rosso to use the photos contained in the disk whenever he needed to do so.  Rosso testified he would use one of the Gener-created photographs on a shopper whenever he felt it was superior to the one he took.

50.  The act of choosing one photo of a product over another is an indication of the photographs' originality.

51.  Emma Vilella, Adcom's Comptroller,  testified in the course of trial that Adcom has on occasion obtained product images from online sources, and has paid anywhere

from $100+ to $400+ for limited licenses to use them, the licenses being expressed in the form of written agreements.

52. Following the litigation in Commonwealth Court over ownership of the tangible photos which were stored digitally on his computer, Gener did not have master copies of the photographs he had created.

53. Gener proceeded to collect all copies of the printouts of the photos attached to his invoices, and assembled all 482 photographs that had been stored on his computer from the copies of the originals attached to his invoices.

54. In April 2001, after the conclusion of the Commonwealth Court litigation, Gener sought the assistance of counsel to register his photographs with the Copyright Office, since he was aware that without registration he could not seek remedies for any copyright infringement of his photographs.

55. Copies of printouts of all 482 photographs which had been attached to the invoices were filed with Gener's original application for copyright registration to meet the deposit requirement. **Exhibit 4.**

56. On the registration form, Gener's former attorney incorrectly informed the Copyright Office that he was registering a "collection" of photographs and not the individual photographs themselves.  He also improperly left out the publication dates of the photographs, so that the registration was incorrectly processed as an application to register an "unpublished collection" of photographs. The Copyright Office issued Certificate of Registration #VAu529-609 to Frank Gener for

"Photographs Collection of Frank Gener Villar-Vol. I", dated July 16, 2001.
**Exhibit 5.**

57. Neither the copyright registration form nor the Copyright Office regulations required Gener or his attorney to inform the Copyright Office of the prior litigation over the tangible photographs in State Court.

58. Some six months following registration, beginning on or about January 3, 2002, Gener began to recognize his photographs, published without his consent, in Mr. Special's advertisements in newspapers. He sought shoppers as they appeared in newspapers and was able to identify his photographs. **Exhibit 6, 1-24.**

59. At the instant trial, Adcom's principal Debbie Alonso testified, "Of course I used the images; I owned them." She made no distinction between her possession of the tangible images of Gener's photographs and the right, under copyright law, to reproduce them.

60. Gener would also compare the photographs appearing in the shoppers with the ones kept with his invoices and confirmed his suspicions that these were his photographs.

61. From January 7, 2002, to July 2003, Gener identified sixty four (64) photographs taken by him appearing in Mr. Special Shoppers without his authorization, at which time he sought counsel to file this suit. **Exhibits 6, 1-24.**

62. On July, 2003, Gener filed the copyright infringement action of caption in this federal Court, against both Adcom and Mr. Special.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 15

63. It would have been futile for Gener to ask Adcom and Mr. Special to stop using his
photographs, since he had warned Adcom from the beginning of the litigation in the
Commonwealth Court that he was claiming copyright rights over the photos, and
that did not stop Adcom from continuing to use the photographs.  It was only after
the First Circuit Court of Appeals vacated the initial dismissal of this federal action in
2006—three years after commencement of the current action—that Adcom ceased
using the photographs, under advice of counsel.

64. As during the Commonwealth Court litigation, following the filing of the federal
claim, Mr. Special took no action to try and find out if Gener's photos were being
used in Mr. Special's shoppers, or to ensure that Gener's photos were not used in its
shoppers.

65. On January 30th, 2004, during the course of discovery in the current suit, Adcom
was served with an interrogatory from Gener containing the following:

> 16. List all other photographs, belonging to Plaintiff's *Photographs
> Collection of Frank Gener-Villar Volume I,* which consists of 482 still
> photographs and images of commercial products which ADCOM has
> reproduced, distributed or placed in ad campaigns for MR. SPECIAL
> SUPERMARKETS, INC. and/or other clients as well.  Provide the dates
> each was reproduced and placed.

Adcom was provided with copies of all four hundred and eighty two (482)
photographs for purposes of comparison to enable it to answer the
interrogatory.

66. Two years later, on March 16, 2006, Adcom responded to the interrogatory under penalty of contempt sanctions by this Court, with the following admission under oath:

> 16.    Adcom states that it has used the photographs…made by Gener…Once litigation ensued in the State Courts, the data bank where the photographs in question were stored was deposited in the Clerk's Court by Court Order.  This caused that ADCOM had to make again most of the data bank photographs comprised in the still products photographs taken by Gener… After almost five months, the data bank was returned to ADCOM by Court Order, at which time some of the photographs originally taken by Gener were needless. Attached is a list of photographs, and the dates in which they were used in 'shoppers' and 'press ads'…

67. From Adcom's 32-page list of Gener's four hundred and eighty two (482) still photographs, attached to Adcom's answers to interrogatory No. 16, it appears that Adcom's unauthorized use of Gener's photographs began in May 2001, and continued up through March 2006, during which time a total of one hundred and fifty four (154) of Gener's four hundred and eighty two (482) photographs were published by Adcom without Gener's consent.

68. The one hundred and fifty four (154) Gener's photographs published during that period were: 001, 002, 003, 004, 005, 008, 009, 011, 012, 014, 015, 017, 018, 020, 021, 025, 026, 027, 041, 045, 066, 068, 069, 074, 075, 076, 078, 079, 080, 081, 082, 086, 087, 088, 091, 100, 101, 102, 103, 136, 137, 141, 142, 144, 151, 154, 157, 159, 160, 161, 162, 163, 164, 167, 182, 189, 212, 214, 219, 221, 222,

224, 226, 227, 228, 229, 232, 236, 238, 240, 241, 244, 245, 248, 258, 260, 263, 264, 268, 269, 271, 272, 275, 281, 282, 283, 286, 287, 288, 292, 313, 314, 315, 317, 320, 321, 322, 325, 326, 331, 333, 334, 336, 337, 340, 362, 366, 367, 368, 372, 373, 374, 386, 387, 388, 400, 403, 404, 406, 408, 409, 410, 414, 416, 420, 422, 426, 430, 431, 432, 433, 434, 435, 439, 440, 441, 445, 446, 447, 451, 452, 454A, 454B, 457, 458, 460, 461, 473, 474, 475, 476, 477, 481, 482.

69. Of these one hundred and fifty four (154) photographs, nineteen (19)—003, 005, 008, 009, 012, 020, 074, 075,189, 275, 287, 288, 322, 334, 410, 433, 445, 461, and 481—were published prior to Gener's initial copyright registration, and are therefore not subject to statutory damages. The remainder—one hundred and thirty five (135) photographs—were, on Adcom's admission, first published without permission on or after July 18, 2001, and are accordingly subject to statutory damages.

70. The one hundred and fifty four (154) photographs used by Adcom without permission were published a total of 1,263 times.  The nineteen (19) images published prior to Gener's registration account for three hundred and three (303) of these publications. The remaining nine hundred and sixty (960) publications occurred after the effective date of Gener's initial registration.

71. On February 28, 2008, Gener filed two (2) corrective registrations with the Copyright Office pursuant to Copyright Office regulations. These registrations, VA1-427-880 and VA1-427-881, corrected the error in Gener's initial registration of

describing two (2) years of published images intended to be registered individually as a compilation of unpublished work.  **Exhibits 11, 12.**

## CONCLUSIONS OF LAW

**1. Plaintiff Established a Prima Facie Case of Copyright Infringement.**

To establish a *prima facie* case of copyright infringement, a claimant in a copyright suit must prove by the preponderance of the evidence that he is owner of a valid copyright, and that the defendants violated at least one of the exclusive rights granted to copyright holders by the copyright law.  *See* Johnson v. Gordon, 409 F.3d 12, 17  (1st Cir. 2005); Pods, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1368 (C.A. Fed. Cir. 2007); General Universal Sys. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001); M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1490 n.7 (11th Cir. 1990).  These rights include the copyright holder's exclusive right, in relevant part:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the

public by sale or other transfer of ownership, or by rental, lease, or lending;

*See* 17 U.S.C.A. §102(a) (2008).

This standard is reflected in the copyright law itself, in relevant part in 17 U.S.C.A. §§102-104 (which list exclusive rights of the copyright holder), and §501(a) which provides

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 19

that "[a]nyone who violates any of the exclusive rights of the copyright owner…is an
infringer of the copyright or right of the author, as the case may be."

### a. Gener Holds a Valid Copyright in the Photographs at Issue.

### i) Gener has Shown He is the Author of the Works.

Copyright protection begins when a work—in this case, the photographs at issue—assumes tangible form, and vests initially in the author of the work. *See* 17 U.S.C.A. §201.  In this case, plaintiff Gener is unquestionably the author of the works at issue.  Gener testified how he and he alone produced the photographs.  He set the lights; he wielded the camera; he manipulated and altered the raw photographs in Photoshop until they assumed an acceptable finished form.  He worked to the deadlines imposed by the defendant Adcom, but on his own time, on his own equipment, pursuant to a freelance contract. Despite Adcom's attempts to mount collateral attacks on the validity of plaintiff's copyrights, it did not challenge the fact that Gener was the actual author of the works in any of its pleadings, and did not present evidence at trial to the contrary.

### ii) The Works at Issue are Original Works, Entitled to Copyright Protection.

Plaintiff's copyright certificates, both the original and the corrected, are themselves *prima facie* evidence of the originality of the works at issue. It should not be necessary to even address this issue   However, given that Adcom has contested the issue in the pleadings, this court confirms the originality of the works at issue in support of plaintiff's copyright claims.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 20

Plaintiff Gener's testimony confirms the originality of his work. The work itself is "original" to him, and to this court, in the fundamental copyright sense that the images he produced were generated by him and him alone, not by copying the photographs of anyone else and without the addition of any independently copyrightable contribution by anyone else.

Gener's photographs are also "original" in the secondary copyright sense of his having lifted his images above the merely representational. Plaintiff testified extensively as to his work producing the raw photographs, determining lighting, positioning, and camera angles, and to his subsequent alteration of the raw photographs, cropping, altering, and manipulating them in order to produce a finished image with element that are separable from its utilitarian market aspects. Both these aspects of originality are addressed by the Supreme Court in Feist Publications v. Rural Telephone Service:

> Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. *1. M. Nimmer & D. Nimmer, Copyright §§ 2.01[A]*, [B] (1990) (hereinafter *Nimmer*). To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. *Id.*, § 1.08[C][1]. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying. Feist, 499 U.S. 340, 344 (1991).

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 21

The courts have found photographs copyrightable as original works for over 100 years, going back to Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 4 S.Ct. 279, (1884). Photographs of products, as in the instant case, are also considered copyrightable, even if they are more or less straightforward representations of a product. An excellent and detailed analysis of the availability copyright protection for product photographs is set forth in Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068 (9th Cir. 2000), and its companion case Ets-Hokin v. Skyy Spirits, Inc., 323 F.3d 763 (9th Cir. 2003). The facts of this case are similar in many points to the instant case; both the points of similarity and the points of difference favor plaintiff Gener.

In Ets-Hokin, a commercial photographer hired to photograph a vodka bottle claimed copyright infringement on the part of his former client/licensee, for exceeding the grant of license and for having other photographers make photographs substantially similar to his. His claim was originally rejected by the District Court, but the Ninth Circuit reversed, holding after exhaustive analysis that the product photos were not derivative works, but were independently copyrightable and subject to protection. The circuit remanded the case to the District Court, where photographer Ets-Hokin lost—because he had failed to establish that substantial similarity existed between his photographs and those taken by other photographers.

Both of these cases support the plaintiff here. The Ninth Circuit's analysis in the first Ets-Hokin case establishes beyond doubt that Gener's photographs merit copyright protection. Though Ets-Hokin lost his case on remand, that decision supports Gener's

claim here, for Ets-Hokin was attempting to establish similarity between his images and images taken by other photographers.   In the instant case, Gener is not claiming infringement based upon the substantial similarity of his work to product photos taken by others; he is claiming infringement on the grounds that the defendants used his actual photographs—subject to copyright protection under the Ets-Hokin standard—without license or permission. Thus, Ets-Hokin's loss on remand, affirmed by the Ninth Circuit on appeal, does not affect or harm in any way the validity of Gener's cause of action here.

The Copyright Office Visual Arts examining division has twice examined the works at issue, and has twice found sufficient originality to support granting a registration and issuing a registration certificate.   The Copyright Office examiners exist for the purpose of passing judgment upon the originality of the works submitted, and grant or refuse registration based upon their examinations.    A certificate of copyright constitutes *prima facie* evidence of ownership and originality of the work as a whole. Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005). After all, "[o]ne purpose of the registration requirement is to allow the Copyright Office to make an initial judgment about the validity of copyrights, based on its experience and expertise, and to reduce the burdens of litigation by giving that judgment some weight in subsequent litigation." Torres-Negron v. J & N Records, LLC, 504 F.3d 151, 162 (1st Cir. 2007).   Upon the plaintiff's production of such a certificate, the burden shifts to the defendant to demonstrate some infirmity in the claimed copyright. CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1513 (1st Cir. 1996).   Adcom provided no evidence to challenge Gener's claim of originality of each particular photograph he took.

Gener also testified that individual photographs were occasionally rejected in favor of others—and that new photographs of the same product or item were taken when the existing photograph was considered by Adcom or Mr. Special to be "stale" or overused. This testimony was confirmed by the testimony of Rosso, and Adcom's President, Debbie Alonso.  The rejection of one photograph in favor of another, and the substitution of one photograph for another of the identical item on the grounds of "freshness" shows that the photographs were considered by Adcom and Mr. Special to possess distinctive characteristics—in short, to possess the "originality" of creativity in addition to the originality of plaintiff's sole authorship.

### iii) Gener is the Holder of a Valid Copyright, and of a Valid Copyright Certificate.

This court examined both the original copyright registration certificate VAu529-609, and the corrective registration certificates VA1-427-880 and VA1-427-881 filed by Gener. The original registration was made in 2001, within five (5) years of plaintiff's creation of the works in 1999 and 2000, is of itself *prima facie* evidence that plaintiff is the author and holder of valid copyright in the works in question.

> In any judicial proceedings the certificate of a registration made before or **within five years after first publication** of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court. 17 U.S.C.A. §410 (c) (emphasis supplied)

It is also *prima facie* evidence that the plaintiff's work is original: "A certificate of copyright constitutes *prima facie* evidence of ownership and originality of the work as a whole." Johnson v. Gordon, 409 F.3d at 17.  No testimony elicited by defendants' counsel on cross-examination has in any way undermined their validity, nor the originality of plaintiff's work.

The corrective registrations admitted as evidence eliminate certain errors in the initial registration that plaintiff has admitted in prior pleadings.  However, those corrections do not affect the earlier date of plaintiff's initial registration or plaintiff's status as author, nor the protection of copyright in the works:

> **Corrections and Amplifications.** — The Register may also establish, by regulation, formal procedures for the filing of an application for supplementary registration, to correct an error in a copyright registration or to amplify the information given in a registration. Such application shall be accompanied by the fee provided by section 708 and shall clearly identify the registration to be corrected or amplified. The information contained in a supplementary registration **augments but does not supersede** that contained in the earlier registration. 17 U.S.C.A. §408(d) (emphasis supplied).

There is no time limit or constraint either in statutory law or Copyright Office regulations limiting when a corrective registration may be filed.  Accordingly, the original certificate entered into evidence establishes plaintiff's *prima facie* status as author and copyright holder; the subsequent corrective registrations relate back to and correct the classification of the images, registering them and protecting them as individual works as originally intended.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 25

A "corrective" registration, by its nature, cures errors in the original good-faith registration, supplementing but not voiding that registration. *See* Copyright Office Practices, Compendium II, §624.01(f); *see also Copyright Office Practices, Compendium II*, §632.02(d)(2); "No cancellation required for minor errors." Indeed, plaintiff's original registration remains, and is not cancelled, in the Copyright Office database.  Both the initial registration and the corrective registrations contain the same material in its entirety, consisting of deposit copies made from the hard-copy photographic prints that accompanied plaintiff's invoice records; both have the same copyright claimant, i.e., plaintiff Gener. Accordingly, plaintiff's claims to statutory damages for infringement of the individual images, and to attorney's fees, which are based upon plaintiff's having originally registered his work prior to the infringements confirmed in discovery and introduced into evidence at trial, remain intact upon the strength of plaintiff's initial good-faith registration, timely made prior to defendants' infringements. *See* 17 U.S.C.A. §§411(a), 412, 504(c), 505.

**b.    Plaintiff Provided his Services to Defendants under a Blanket License.**

Gener stated, in testimony confirmed by Adcom's principal Debbie Alonso and in his contract, that he was working for Adcom on a freelance basis and paid a monthly fee.  This fee operated as a blanket license; it was paid to plaintiff regardless of how much or how little creative work he put in to produce the shoppers that Adcom requested.  Plaintiff testified that he provided the defendant Adcom with "camera-ready" art—which plaintiff explained was a completed layout ready for reproduction.  Plaintiff did not provide Adcom

with workable files—that is to say, photographic files which Adcom itself could manipulate. In fact, on the testimony of Rosso, an Adcom employee formerly on Gener's payroll, Adcom would not have known what to do with the photographs, for it lacked both the equipment and the in-house expertise to manipulate them.

Plaintiff was paid a flat monthly fee whether he re-used his existing shopper templates, altered them as needed, or created new ones.  When Adcom agreed to pay him extra for the time he spent producing photographs for the shoppers, the work product of his photography sessions was also licensed to Adcom on a monthly usage basis, just as his shopper templates were.

Under cross examination, Gener was asked by opposing counsel whether he had been trained as a photographer.  Training or schooling is irrelevant.  Gener was hired by Adcom to provide graphic arts services, and did so to Adcom's satisfaction for a period of five (5) years.  In the course of that time, Gener also produced the photographs here at issue, which were acceptable in quality to Adcom.  Adcom was, in fact, so pleased with his work product that it was willing to embark upon litigation in state court to wrest control of the tangible photographs of his work from him, and later fight him in federal court for five (5) years.  They were so useful to Adcom that it used his work for another six (6) years even after he and Adcom parted ways, and the evidence showed that Adcom only ceased to do so in hopes of mitigating the damages it owes to the plaintiff under this litigation, only after the Circuit Court of Appeals vacated an earlier judgment of this Court in early 2006.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 27

### c. There Was No Transfer of Gener's Copyrights to Adcom.

### i)  Gener Did Not Transfer Rights pursuant to Agreement.

Copyright rights transfers *must* be made in writing.   Adcom's Debbie Alonso admitted that there was no such writing, referring in her testimony only to a "verbal agreement."   Even if such a verbal agreement did exist and did in fact correspond in its terms to Alonso's interpretation—and plaintiff's actions before, during and after the state court litigation show that it did not—such an agreement would not be legally sufficient to transfer the rights that Adcom claims.

> (1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession. 17 U.S.C. §201(d)

> *and* A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent. 17 U.S.C.A. § 204(a)

Plaintiff's written contract with Adcom to provide services—which Adcom itself wrote—does not mention or address any copyright interests, let alone transfer any copyright interests to Adcom.

If any oral agreement between plaintiff and Adcom existed, it was to pay plaintiff a small fee for the additional time he spent in *producing* the photographs at issue.  But the *use* of the photographs was subsumed into Adcom's blanket license payment, and cannot in any way be construed to be a copyright transfer.   No written agreement exists which

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 28

transferred plaintiff's copyrights to Adcom, and without such an agreement no such transfer can have occurred.  No license to Adcom existed beyond the monthly blanket license which existed under plaintiff's written agreement, and that license terminated when Adcom terminated plaintiff Gener's contract.

### ii) The State Court Decisions Transferred No Copyright Rights to Adcom.

The state court which awarded possession of plaintiff Gener's tangible photographs to Adcom specifically declined to rule upon any copyright issue.  The state court did rule that the contract under which it granted Adcom custody of the plaintiff's *tangible works* was not work for hire—which is the only way that Adcom could have acquired rights in plaintiff's work "by operation of law," as specified in §§ 201(d) and 204(a), cited *supra*.  **Joint Exhibit I.**  More importantly, the law makes a clear distinction between the ownership of a material object, such as a digital photograph on a disk, and the ownership of the intangible copyright right over that photograph.  *See* 17 U.S.C.A. §202.

In light of §202, and the requirement under §§ 201(d) and 204(a) that copyright transfers must be written, defendant Debbie Alonso's statement in the course of her testimony that—"of course I used the photographs—I owned them" amounts to an express admission of copyright infringement by herself and Adcom, for her "ownership" consisted only of ownership of the *tangible photos* which the state court awarded her—not to any copyright interest whatsoever.

Frank Gener Villar v. Adcom Group, Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 29

From the start through the conclusion of the state court proceedings and thereafter, Adcom had no reason to believe that it had acquired any right to reproduce plaintiff's works without his permission.  Its choice to do so, and the unlimited reproduction and publication indulged by the parties during the time they had been litigating at the state and federal levels and which they continued doing up to the year 2006, constitutes willful infringement.

**d.  Adcom Subsequently Reproduced Gener's Work without Having Acquired Rights, Permission, License or Payment.**

Having acquired Gener's tangible images by operation of the state court, Adcom proceeded to use them by reproducing them in its shoppers, without payment to Gener. Rosso testified how he was given a disk of Gener's photographs originally held by Adcom's printer, and how he was directed to use and re-use the images that it contained.  Adcom president Debbie Alonso, in her testimony, provided confirmation that Adcom did, indeed, reproduce Gener's actual images repeatedly in shoppers, without a license from the plaintiff. Her direct statement on the stand was, "Of course I used them; I owned them." **Exhibit A.**

The only specific record of such reproduction was provided by Debbie Alonso. When requested to produce a record of Adcom's usage of plaintiff's photographs, in written interrogatories, Ms. Alonso produced, under oath, an extensive table detailing Adcom's use of 154 of plaintiff's images from July 18, 2001, through 2006, at which time Adcom stopped using the photographs by instructions of Adcom's counsel.

e.    **Infringement.**

**i) Defendant Adcom is Liable for Direct and Willful Infringement.**

Adcom had possession of the tangible photographs, and was directly responsible for creating and distributing the shoppers in which the photographs were reproduced, after Adcom had terminated its relationship with Gener, and thus terminated the blanket license under which it was permitted to reproduce Gener's work.

Having acquired the tangible photographs by order of the state court, Adcom had specifically not acquired any right to reproduce them.  Yet it embarked upon a pattern of unauthorized reproduction which continued up through 2006.

**ii)  Adcom Cannot Plead "trade custom" in Mitigation.**

Adcom employee Emma Vilella Calderon admitted in her testimony that Adcom licenses product photos, with other photographers, and in writing for limited usage—and for prices far higher than Adcom paid Gener to create the photographs he licensed to Adcom under his blanket license.  These product photos are images subject to written licenses and usage restrictions.   In short, these product photographs are copyright-protected. Accordingly, Adcom is well aware that the alleged "trade custom" does not override the copyright law. It appears that Adcom has no difficulty understanding that product photographs are copyright protected and are subject to restricted usage—except as to the images produced by the plaintiff Gener.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 31

### iii) Adcom Acquired no "implied license."

In its Rule 52(c)[2] motion, defendant Adcom argued that the defense of implied license, which had previously been deemed waived by this Court, should again be applied. According to Adcom, when Gener questioned Adcom's comptroller Emma Vilella about the existence of other licensing agreements which Adcom had entered into, this opened the door for questioning Vilella regarding Gener's alleged oral license agreement with Adcom.

During questioning Vilella responded affirmatively to a question about whether the alleged license with Gener was "unlimited."  Even if we were to assume that the pleadings were amended by Adcom's question and Vilella's response, we find the response not credible.  It is difficult to believe that Vilella, who had previously testified that her relationship at Adcom was merely limited to writing the checks and paying the bills, also has knowledge of Gener's verbal agreements with Adcom, and—more than that—knowledge sufficient to claim that the alleged license was "unlimited", whatever she means by that term.  However, even if we were to believe her testimony, and assume there was an "unlimited" license and take "unlimited" to mean not a blanket license as raised in Gener's testimony, but rather a non-exclusive license, and even if we were to ignore this court's ruling that such defense was waived by Adcom, the defense fails on independent grounds.

---

[2] After plaintiff was fully heard, ADCOM and Mr. Special presented an oral motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c).  The court declined to render any judgment until the close of the evidence.

First, the burden of proving the existence of such a license is on the licensee party claiming its protection. John G. Danielson, Inc. v. Winchester-Conant Props. Inc., 322 F.3d 26, 40-42 (1st Cir. 2003); Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995).

Under current precedent "implied licenses are found only in narrow circumstances." John G. Danielson, Inc., 322 F.3d at 40, quoting SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms. Inc., 211 F.3d 21, 25 (2d Cir. 2000). Adcom never met its burden of persuading this Court of the existence of a license with Gener when the door allegedly was opened by questions related to Adcom's licenses with other photographers. Adcom pretends to carry its heavy burden, relying entirely on a single one-word answer from Vilella, Adcom's comptroller, in a response which presupposed, but did not establish, the existence of a license with Gener. However, Vilella testified nothing at all about who said what to whom about a license, and nothing whatever as to the terms of the license. To the contrary, Debbie Alonso, the president of Adcom, with authority to engage in such license agreements testified that Adcom used the photographs not because it was operating under a license granted by Gener, but because state court had granted Adcom ownership of the photographs. Debbie Alonso's testimony squarely contradicts Vilella's testimony that Adcom was operating under a "license" with Gener. At all times Adcom has acted as if it held the copyrights to the photographs, not as if it were a licensee. Adcom simply did not carry its burden, and failed to show that Gener granted Adcom a license of any kind for use of the disputed photographs after Adcom terminated the contract.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 33

This is magnified by the legal standard, where the touchstone for finding an implied license is intent. See John G. Danielson, Inc., 322 F.3d at 40;; Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 514-16 (4th Cir. 2002) (calling intent "determinative question"); Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998) ("Without intent, there can be no implied license.").

Here, the testimony at trial showed that Gener intended to allow Adcom to use the photographs in the shoppers as long as he continued to receive his monthly licensing fee. Adcom, on the other hand, has never recognized that Gener holds copyright in the photographs of which it now claims to be a licensee.  To the contrary, it has claimed a right to publish the photographs at all times on the grounds that it was awarded the ownership of the photographs on the disk.  Thus, Gener's testimony indicates that he had no intent to license absent ongoing payment, while Adcom's testimony indicates that it did not believe a need for a license existed.  Certainly, therefore, Adcom cannot claim that it had acquired by implication something it did not seek or believe necessary.

### iv. Defendant Mr. Special is Vicariously or Contributorily Liable for the Infringements.

Vicarious or contributory liability is incurred when an infringer, while not engaging in an infringement on its own, has control over the establishment where an infringement occurs, or the means by which an infringement takes place; knows, or has reason to know, that the infringement is occurring, and does nothing to stop it.

<u>Frank Gener Villar v. Adcom Group. Inc., et al.</u>
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 34

The best-known copyright cases involving vicarious liability are the "dance hall" cases, where vicarious liability was found when dance hall owners allowed the unauthorized public performance of musical works by the bands they hired, even when the owners had no knowledge of the infringements and had even expressly warned the bands not to perform copyrighted works without a license from the copyright owners. *See, e.g.,* <u>Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.</u>, 36 F.2d 354 (7th Cir. 1929); <u>Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc.</u>, 554 F.2d 1213 (1st Cir. 1977); <u>KECA Music, Inc. v. Dingus McGee's Co.</u>, 432 F. Supp. 72 (W.D. Mo. 1977). Indeed, the "cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income. He is liable whether the bandleader is considered, as a technical matter, an employee or an independent contractor, and whether or not the proprietor has knowledge of the compositions to be played or any control over their selection." <u>Shapiro, Bernstein & Co. v. H.L. Green Co.</u>, 316 F.2d 304, 307 (2d Cir. 1963) (citing some 10 cases). *See also:* <u>Boz Scaggs Music, et. al., v. KND Corp., et. al.</u>, 491 F.Supp 908, 1980; <u>Gershwin Publishing Corp. v. Columbia Artists Management</u>, 443 F.2d 1159 (2d Cir. 1971).

In the instant case, Mr. Special had control over the choice and placement of the products in the shoppers produced by Adcom.  Mr. Special admitted that it was aware of Gener's case from the time it had been served, in 2003—but that it had done nothing to stop or forbid the use of Gener's images in the shoppers.  No orders were given to Adcom

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 35

that it not use the contested Gener images in the shoppers, not even an order in such vague

form as "do not use any photographs that are the subject of litigation."

This lack of action in the face of litigation would itself be sufficient to subject Mr.

Special to vicarious liability, but Adcom president Debbie Alonso has testified that Mr.

Special was aware of who had produced a photograph for a particular shopper on the basis

of the photographer's name appearing on the invoice sent to Mr. Special.  Therefore, Mr.

Special knew, or had reason to know, that it was implicated in plaintiff Gener's suit; it knew,

or had reason to know, on the basis of the invoices it received from Adcom, that these

disputed photographs were being used in its shoppers on a regular basis.  Yet, it did nothing

whatsoever to guard itself from liability.  It had the power to stop the infringements; it did

not do so.  It had the means to learn how many of Gener's images were appearing on a

regular basis in its advertising material; it paid no heed.  It did nothing, on the emphatic

admission of Mr. Santos Alonso. Under the ballroom cases, Mr. Special thereby acquired

vicarious or contributory liability for the infringement of Gener's works.

**f.     Defendant Mr. Special Incurred in Direct Liability by Distributing the Shoppers Carrying the Infringing Images in its Stores.**

In addition to its liability under contributory and vicarious liability, Mr. Special is

directly liable for infringement on the grounds that it *distributed* the shoppers containing the

infringing copies.  Section 501(a) of the copyright law holds liable as an infringer "anyone

who violates any" of the exclusive rights held by the copyright holder.  One of those

exclusive rights is distribution. *See* Title 17 U.S.C.A. §102(a).  *See also*, Ortiz-Gonzalez v.

Fonovisa, 277 F.3d 59, 62 (1st Cir. 2002); "Public distribution of a copyrighted work is a right reserved to the copyright owner, and usurpation of that right constitutes infringement."

Mr. Special engaged directly in distribution of the shoppers prepared on its behalf—the shoppers which it knew, or had reason to know, contained infringing copies of the plaintiff's photographs.  It admitted to distribution of the shoppers in its Motion for Summary Judgment (Dkt. #87: Motion, p. 2, #8; Exhibit 2, Statement of Uncontested Facts, p. 2, #8), and in the Joint Pre-trial Order (Dkt. #122, p.10, the third from the last paragraph under Mr. Special's entry for "Factual Theory of the Case").

### g. Both Defendants Adcom and Mr. Special Have Acted Willfully in their Infringement of plaintiff Gener's Copyrights.

Under the Copyright Act, a copyright owner can elect to receive statutory damages, and  trial courts have discretion to enhance the damages, up to a statutory maximum, for willful infringement. 17 U.S.C.  504(c).  Although the statute does not define willful, it has consistently been defined as including reckless behavior. *See, e.g.*, Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 112 (2d Cir. 2001) ("Willfulness in [the context of statutory damages for copyright infringement] means that the defendant 'recklessly disregarded' the possibility that 'its conduct represented infringement.' ") (quoting Hamil Am., Inc. v. GFI, Inc., 193 F.3d 92, 97 (2d Cir. 1999) (additional citations omitted)); Wildlife Express Corp. v. Carol Wright Sales, 18 F.3d 502, 511-12 (7th Cir.  1994) (same); RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co., 845 F.2d 773, 779 (8th Cir. 1988) (same); *see also* eBay Inc. v. MercExchange, L.L.C., --- U.S. ----, 126 S.Ct. 1837, 1840, 164 L.Ed.2d 641 (2006) (noting

with approval that its resolution of the permanent injunction standard in the patent context created harmony with copyright law). *And see* In re Seagate Technology, LLC, 497 F.3d 1360 (C.A.Fed. N.Y. 2007).

Adcom has done so by directly and willfully using material to which it knew, or should have known, it had no right to reproduce and distribute. Mr. Special has done so by willfully refusing to exercise even the remotest element of the control which testimony has shown it had over the content of the shoppers produced for its benefit, and by heedlessly distributing the shoppers containing the infringed images which it did not trouble itself to investigate, let alone forbid, even after it was sued in this court.

**h.    Damages.**

**i) Adcom Cannot Show Gener Failed to Mitigate his Damages.**

Defendant Adcom argued in its Rule 52(c) motion for judgment on the pleadings that Gener had not mitigated his damages, in that he did nothing to advise Adcom through letters or other notice to stop using his photographs following the end of state court litigation in 2001. Adcom argued that Gener should have mitigated his damages by offering a prior warning in anticipation of litigation.

The mitigation doctrine of avoidable consequences is a fundamental rule of damages requiring the injured party to take advantage of reasonable opportunities to minimize his damages and avoid or prevent loss. See, e.g., Conjugal Partnership by Joseph Jones v. Conjugal Partnership Pineda, 22 F.3d 391 (1st Cir. 1994); Noble v. Corporacion Insular de Seguros, 738 F.2d 51, 55 (1st Cir. 1984) (only those who are able to mitigate must do so);

Frank Gener Villar v. Adcom Group, Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 38

see also <u>Bank One, Tex., N.A. v. Taylor</u>, 970 F.2d 16, 29 (5th Cir. 1992).   Under this

doctrine, an injured party with an otherwise valid cause of action who fails to mitigate his

damages may not recover those damages shown to have resulted from his failure to use

reasonable efforts to avoid or prevent the loss. *Id.*

The evidence does not support Adcom's assertion that Gener failed to mitigate his

damages by failing to send Adcom notice of his intention to protect his copyrights in federal

court.   It is clear from the record, particularly the stipulated record of the State Court

judgments, that as of May 2000 Gener made Adcom aware he was claiming that Adcom's

objective in seeking to take the tangible photographs was the acquisition of his copyrights.

Gener further argued that the Federal District Court was the proper forum with jurisdiction

to hear any copyright claim, and that any dispute over those rights should be addressed in

that court, not in state court.

The state court properly avoided assuming jurisdiction over the issue of the

copyrights and declined to hear that controversy, but it is clear that Adcom and Mr.

Special—which was informed by Ms. Alonso about the state court litigation—were aware,

or should have been aware, that Gener had indeed raised the copyright issue.  The warning

was so clear that it was incorporated into the judgment of the Court of First Instance in May

2000, and reiterated one (1) year later by the Puerto Rico Court of Appeals in 2001.

These warnings by Gener were a sufficient effort on his behalf to prevent his loss.

Gener squarely told Adcom in no ambiguous terms that he had a copyright claim over the

photographs, and that he would pursue his copyright rights in federal court even if Adcom

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 39

obtained property of the tangible disk and photographs. The fact that Gener lost the state claim over the tangible works in no way diminished Gener's warnings, clearly set forth in the state court judgment in May 2001. Adcom cannot state that Gener did nothing to prevent his loss when he expressly placed Adcom on notice at least twice that he would bring suit in federal court to remedy any copyright infringement. When motions before a Commonwealth Court are served on opposing parties, and when the Court itself incorporates the warnings of those motions regarding the possible adjudication of claims in a separate trial in federal court, we see little else a dunning letter to Adcom could have done to stop it from embarking upon and continuing its infringements.

Given that Adcom did not heed these warnings, we must conclude that any further warnings would neither have modified Adcom's behavior nor prevented further damages to Gener's rights.   The best evidence of such futility is Adcom's own behavior after being served with the complaint in this case; Adcom proceeded to fight, and filed summary judgment in this Court on grounds that as the owner of the tangible photographs it was also owner of the copyrights.  It took an opinion of the Court of Appeals, well after two (2) years of litigation, to finally persuade Adcom to stop engaging in ongoing infringement, and issue orders to its personnel to stop using the photographs. If the onset of federal litigation did not stop Adcom from infringing the photographs, letters or telephone calls would have done even less. If Adcom did not fear federal court litigation—and resisted acknowledging its infringement once haled into court—that points to the willfulness of Adcom's infringement.

Yet Adcom now wants to benefit from a mitigation defense the warnings it received fell on deaf ears.

In a case like this, where a lawsuit did not stop Adcom from its contumacy, Gener would have been performing an act of futility to try to repeat warnings to Adcom that it was infringing his copyrights. The act of sending letters to a party he was already litigating with would do nothing to prevent infringements of his work.  In such cases, the plaintiff need not seek mitigation of damages. *See* Ford v. Nicks, 866 F.2d 865, 873 (6th Cir. 1989) ("an employee is not required to go to heroic lengths in attempting to mitigate damages, but only to take reasonable steps to do so."); *see also* Cooney Indus. Trucks v. Toyota Motor Sales, U.S., 168 F.3d 545 (1st Cir. 1999) (the law imposes on plaintiff the duty to take reasonable steps to mitigate damages); Allied Intern, Inc. v. International Longshoremen's, 814 F.2d 32 (1st Cir. 1987) (possibility of mitigation is in nature of affirmative defense and it is defendants who bear burden of proving by fair preponderance that injured party failed to take reasonable steps to hold down its losses).

In NLRB v. Cashman Auto  Co., 223 F.2d 832, 836 (1st Cir. 1955), the First Circuit noted, over half a century ago, that the principle of mitigation of damages does not require success; it only requires an honest good faith effort by the complaining party.  *See also,* NLRB v. Madison Courier, Inc., 153 U.S. App. D.C. 232 (D.C. Cir. 1972).   Gener, by raising copyright claims in the very litigation that did not allow him to raise those claims, met the good faith effort standard and warned Adcom of its danger of infringement.  He was under no duty to continue warning after the warning had been communicated in the

language of two judgments.  He was not required to continue any extrajudicial effort after he filed suit in federal court, after which Adcom continued its infringement for two additional years while the federal litigation was ongoing.

### ii)  Plaintiff is Entitled to Damages.

Plaintiff may elect to receive either actual damages and the infringers' profits as recovery, or rely upon the discretion of the court for an award of statutory damages. Section 504(c) of the act states that a copyright owner can elect to recover statutory damages "for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually."

Section 504 (c) provides:

> **(a) In General.**--Except as otherwise provided by this title, an infringer of copyright is liable for either–
> **(1)** the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or
>  **(2)** statutory damages, as provided by subsection (c).
> **(b) Actual Damages and Profits.**--The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.
> **(c) Statutory Damages.--**
> **(1)** Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this

subsection, all the parts of a compilation or derivative work constitute one work.

**(2)** In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in subsection (g) of section 118) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

Here, plaintiff Gener is seeking statutory damages for the one hundred and thirty five (135) images that were first infringed following his initial registration with the Copyright Office. Under the Act, this court has discretion to select a figure anywhere between $750 to $30,000 per work infringed. The infringements engaged in by Adcom and Mr. Special, as established by the evidence, extended over a period of six (6) years, from 2001 through 2006 inclusive.

The court is also mindful that in cases involving groups of works, such as songs of record, the First Circuit, as has other circuits, interpreted "infringements" in this section to apply to works infringed not to the times each work was infringed:

Frank Gener Villar v. Adcom Group, Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 43

> The prevailing reading in the circuits is the one that we join: under § 504(c) the total number of "awards" of statutory damages that a plaintiff may recover in any given action against a single defendant depends on **the number of works that are infringed** and the number of individually liable infringers and is unaffected by the number of infringements of those works. That reading works in the overall context of the statute, flows naturally from  the statutory language, and is supported by the legislative history. Eagle Ins. Co. v. Bankvest Capital Corp. (In re Bankvest Capital Corp.), 360 F.3d 291, 299 (1st Cir. 2004). We thus agree with the second district judge that "works" in § 504(c)(1) means "songs" in the context of this case.  Venegas-Hernandez v. Sonolux Records, 370 F.3d 183, 194 (1ˢᵗ Cir. 2004) (emphasis ours).

It is a fact that one hundred and thirty five (135) of Gener's photographs were first published without permission by Adcom on or after July 18, 2001.  Thus, it would appear to be a simple task to multiply the number of infringed photos, as were the songs in Venegas-Hernandez by the amount of statutory damages per photo.  We are now to determine the amount of statutory damages without arbitrarily picking a number between $750.00 and $30,000.00.

We do know from the evidence that Adcom's comptroller admitted that Adcom would pay up to $400.00 plus, for a limited use of photographs purchased over the internet with other parties.   We also know from the facts that a total of one hundred and fifty four (154) photographs used by Adcom without permission were published a total of one thousand two hundred and sixty three (1,263) times from May 2001 to early 2006.  That amounts to an average of two hundred and fifty three (253) infringements per year for five (5) years, or on average, a rounded total of two (2) yearly infringements per photo. In arriving at this

number we are mindful that under First Circuit precedent, "[t]he number of infringements is a relevant factor in setting the statutory damages rate," Venegas-Hernandez at 197, citing 2 Goldstein, § 12.2.2.2(a).  So, taking into account the $400.00 admitted figure as limited license, and the number of infringements of 1,263, we conclude the statutory rate per worked infringed is $3,280.00[3] per infringed work.    The total number of infringed works after registration is one hundred and thirty five (135), for an award of **FOUR HUNDRED FORTY TWO THOUSAND EIGHT HUNDRED DOLLARS ($442,800.00).**

That does not end our determination of damages, for we find that defendants' conduct was willful.  Therefore we apply, the statutory sliding scale whose purpose was established.

> to deter willful infringements, and the award can go up to $150,000 per work where willfulness has been found. 17 U.S.C. § 504(c)(2); see H.R. Rep. No. 94-1476, at 162, reprinted in 1976 U.S.C.C.A.N. 5659, 5778 ("The basic principle underlying [§ 504(c)(2)] is that the courts should be given discretion to increase statutory damages in cases of willful infringement and to lower the minimum where the infringer is innocent."); Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 113-14 (2d Cir. 2001) ("Statutory damages are not meant to be merely compensatory or restitutionary. The statutory award is also meant to discourage wrongful conduct. That is why the statute permits consideration of . . . additional damages where an infringement is willful.") (internal citations and quotation marks omitted). *See* Venegas-Hernandez 370 F.3d at. 195.

When a plaintiff sustains the burden of proving an infringement was willful, §504(c)(2) permits the court determining statutory damages to increase the top award from $30,000.00 to $150,000.00—a five-fold increase.  Given that we have determined that the

---

[3]$400.00 x 1,263 ÷ 154 photos= $3,280.00

infringements by Adcom and Mr. Special have been willful, continuing after notice of a lawsuit, we double the statutory damages award above ($442,800.00) for a total statutory damages award of **EIGHT HUNDRED EIGHTY FIVE THOUSAND SIX HUNDRED DOLLARS ($885,600.00)**.

### iii) Plaintiff is Entitled to Final Equitable Relief.

This court has jurisdiction under 17 USCS § 502(a) to grant injunctive relief to prevent or restrain infringement of copyright and enjoin infringement of derivative works. The court determines that plaintiff Frank Gener is entitled to injunctive relief in the form of a permanent injunction so as to avoid continuing infringements that require successive actions to obtain multiple awards. *See* Venegas Hernandez v. Sonolux Records, 370 F. 3d at 194 n. 9; 2 Goldstein, *Copyright,* § 12.2.2.2. That injunction will apply to both defendants to prevent future infringement and distribution of infringed materials.   The express terms of the order are set below.

In light of the above discussed, plaintiff Gener has shown sufficiently to support his case that he is the author of the works and holder of the copyrights in question; that the defendants have engaged in a pattern of willful infringement of his images by reproducing and distributing them over a period of years without his consent; that the defendants had not acquired the right to do so by verbal agreement, written transfer, or operation of law, and that they knew, or had reason to know, that they had not acquired such rights.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 46

## CONCLUSION

For which it is ORDERED, ADJUDGED AND DECREED that the defendants Adcom Group, Inc., and Mr. Special Supermarkets, Inc., as well as each of their employees and agents, whether they do business under any other name, and each person in privity with them, if any, are permanently enjoined from engaging in any of the following activities:

1. Making, advertising, giving away, selling or publicly displaying any writing or visual presentation that contains or includes any copy or representation of any copyrightable photograph of the plaintiff, that appears in any of the copyright works of the plaintiff's, either of the plaintiff's copyright photographs, titled *Group of Photographs 1999,* U.S. copyright registration number VA 1-427-880, and *Group of Photographs 2000,* U.S. copyright registration number VA 1-427-881 (hereinafter referred to as "the infringed materials");

2. Making copies of, advertising, giving away, or selling any of the works of the defendants that this court has found infringe the copyrighted works of the plaintiff;

3. Making any affirmative oral or written representation that they are the author of the infringed materials, or condoning others in doing so; but, they may respond truthfully to inquiries so long as he provides the Corrective Notice to such inquiries.

4. Making any oral or written representation that could mislead or be misconstrued to any person or entity that the infringed materials can be distributed or published, or published, without first obtaining the express written permission of Frank Gener Villar; and

5. For purposes of this Order, the term "writing" means any bound or unbound book, monograph, magazine, "CAT-A-zine," catalogue, or other printed matter; any video-tape, CD-ROM, motion picture, photograph, or photocopy; any Internet, World Wide Web, computer E-mail or computer bulletin board posting.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants shall jointly or severally pay the plaintiff Frank Gener Villar the amount of **EIGHT HUNDRED EIGHTY FIVE THOUSAND SIX HUNDRED DOLLARS ($885,600.00)** and the terms of payment of this judgment shall be as follows:

The judgment shall accrue post judgment interest at the legal rate from date judgment is entered; and provided that post judgment interest shall accrue at the rate of twelve percent (12%) per annum if the defendants shall fail to conform in any material way with the terms of this Judgment;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant Adcom Group, Inc., and Mr. Special, pay plaintiff his full costs and reasonable attorney's fees, as the prevailing party, and as allowed under 17 U.S.C.A. §505. The exact amount of the costs and fees will be determined by the Court under procedures set forth under Local Civil Rule 54(a) and 54(b).

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this court shall retain jurisdiction of the parties and the subject matter for the limited purpose of enforcement of this Order and without prejudice to the right of the plaintiffs to seek execution on the judgment in any court of competent jurisdiction.

Frank Gener Villar v. Adcom Group. Inc., et al.
Civil No. 03-1306 (FAB/CVR)
Opinion and Order
Page No. 48

 

The Clerk is to enter judgment accordingly.

In San Juan, Puerto Rico this 28th day of May of 2008.

                                         s/CAMILLE L. VELEZ-RIVE
                                         CAMILLE L. VELEZ-RIVE
                                         UNITED STATES MAGISTRATE JUDGE